EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

WYETH d/b/a Fort Dodge Animal Health, Defendant.

No. C02–3075–MWB.

United States District Court, N.D. Iowa, Central Division.

Feb. 16, 2004.

Deborah J. Powers, Jean P. Kamp, Rosemary Fox, Milwaukee, WI, for Plaintiff.

Neven J. Mulholland, Johnson, Erb, Bice, Kramer, Good & Mulholland, PC, Fort Dodge, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION AND BACKGROUND* .................................... 1045
   A. *Procedural Background* .......................................... 1045
   B. *Factual Background* ............................................ 1046

II. *LEGAL ANALYSIS* ................................................... 1058
   A. *Standards For Summary Judgment* ................................ 1058
      1. *Requirements of Rule 56* .................................... 1058
      2. *The parties' burdens* ...................................... 1059
      3. *Summary judgment in employment discrimination cases* ......... 1059
   B. *Sexually Hostile Work Environment* ............................. 1061
      1. *Harassment based on sex* ................................... 1062
      2. *Severe and pervasive requirement* .......................... 1063
      3. *Employer liability* ........................................ 1065
         a. *Knew or should have known* ............................. 1065
         b. *Proper remedial action* ................................ 1068
   C. *Retaliation* ................................................... 1069

III. *CONCLUSION* ...................................................... 1071

In a hard fought lawsuit against defendant Wyeth, which operates a veterinary pharmaceutical facility in Fort Dodge, Iowa, plaintiff Equal Employment Opportunity Commission ("EEOC"), asserts claims of sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 based on the allegation of a long time animal care worker, Shelly R.

Kirchhoff. In considering Wyeth's motion for summary judgment, the key issue here is not whether Kirchhoff was "harassed." Wyeth maintains Kirchhoff's tormentor, a male coworker in the same department, was an equal opportunity harasser who harassed his male and female coworkers alike. Thus, Wyeth argues that his conduct was gender-neutral and non-actionable on sexual-harassment grounds. Therefore, among the issues in dispute in this litigation is whether the "harassment" Kirchhoff suffered was because of Kirchhoff's sex. Other issues raised by Wyeth's motion for summary judgment include whether the "harassment" in question was sufficiently severe and pervasive to be actionable, and whether Wyeth knew or should have known that the "harassment" was because of Kirchhoff's sex.

## I.  INTRODUCTION AND BACKGROUND

### A.  Procedural Background

On September 18, 2002, the Equal Employment Opportunity Commission ("EEOC") filed a complaint in this court against defendant Wyeth, d/b/a Fort Dodge Animal Health, alleging two causes of action: (1) a claim of sexual harassment, in violation of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 2000e *et seq.;* and (2) a claim of retaliation for reporting a hostile work environment, in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. Specifically, the EEOC asserts that defendant Wyeth permitted a sexually hostile work environment to exist at its Fort Dodge, Iowa, facility, and that Shelly R. Kirchhoff was retaliated against when she reported acts of harassment to Wyeth managers and Wyeth's human resources department, and later when she filed a charge of sexual discrimination with the EEOC.

Defendant Wyeth has filed a Motion for Summary Judgment on all of the EEOC's claims. In their motion, defendant Wyeth claims that the EEOC cannot establish a *prima facie* case of hostile work environment sexual harassment because the alleged conduct was not based on Kirchhoff's sex. Defendant Wyeth also claims that the EEOC cannot establish that the alleged harassment was so severe or pervasive as to alter a term, condition, or privilege of employment. Third, defendant Wyeth asserts that the EEOC cannot establish that Wyeth knew or should have known about the alleged harassment. Defendant Wyeth further asserts that the EEOC cannot establish that Wyeth failed to take appropriate remedial action when it was informed of harassing conduct on the job site. Moreover, defendant Wyeth claims that the EEOC cannot establish a *prima facie* case of retaliation because Kirchhoff did not engage in a protected activity and there was no resulting adverse employment action. Finally, defendant Wyeth asserts that it had legitimate, non-discriminatory reasons for their actions and that the EEOC cannot establish that Wyeth's proffered reasons were a pretext for illegal discrimination.

On December 3, 2003, the EEOC resisted defendant Wyeth's Motion for Summary Judgment, arguing that there are genuine issues of material fact in dispute regarding all of its claims. On December 18, 2003, defendant filed a reply brief in response to the EEOC's resistance. On December 31, 2003, the EEOC moved for leave to file supplemental affidavits and a brief in opposition to the motion for summary judgment. Following the filing of a resistance to the EEOC's motion, the court granted the EEOC's motion on January 15, 2004, and granted Wyeth until January 22, 2004, in which to file any response it had to the EEOC's sur-reply brief and supplemental affidavits.

Before discussing the standards for defendant Wyeth's Motion for Summary Judgment, however, the court will first examine the factual background of this case.

### B. Factual Background

The summary judgment record reveals that the following facts are undisputed.

Fort Dodge Animal Health manufactures veterinary biologicals and pharmaceuticals designed for use in common animals, as well as horses, beef cattle, dairy cattle, swine and sheep. The Animal Care Department of Fort Dodge Animal Health is located on 360 acres of land, although the Responsible Animal Caretakers have job duties on only 80 percent of that area. The Animal Care Department is separated from Fort Dodge Animal Health's main plant, and the department has a private lunch room, offices, dressing room and showers due to concerns of cross-contamination. The Animal Care workers do not often see workers from the main plant or other departments.

The animals in the Animal Care Department are housed in various outbuildings scattered across the many acres of the department. A Responsible Animal Caretaker is responsible for caring for the animals and must be skilled in handling, selecting, feeding, and otherwise caring for production, control and research animals. Team work is required for performing certain duties of a Responsible Animal Caretaker since workers sometimes have to work side-by-side to accomplish tasks. Tasks in Animal Care which might require team work include: lifting crates weighing 75 to 100 pounds and which may be eight feet high; working with or restraining large animals such as cattle or horses; and caring for the animals.

During breaks and the lunch hour, the Animal Caretakers gather at the central meeting area. In addition, workers gather there every morning to receive their daily assignments. The Animal Caretakers may drive to the various outbuildings to which they are assigned. Because there are not enough vehicles for each worker to have his or her own truck, workers often have to carpool. Animal Caretakers are not directly supervised when they perform their day-to-day duties in the outbuildings and may be the only people present at the outbuildings.

Animal Care workers who are first to complete their portion of the duties in a particular area may, depending on their assigned duties, assist their coworkers in completing tasks until the work in the assigned building is completed.

Shelly R. Kirchhoff has been employed by Wyeth d/b/a Fort Dodge Animal Health, in various capacities from April 30, 1990, to the present. In October of 1997, Kirchhoff bid on and was awarded the position of "Responsible Animal Caretaker" in the Animal Care Department at Fort Dodge Animal Health and has remained in this position to the present time. Since 1997, Kirchhoff has been the only woman in the general rotation of the Animal Care Department. Kirchhoff is capable of performing all her job duties and responsibilities. From 1997 until approximately June of 2003, Myles Van Patten and LeeAnn Ihrke were Kirchhoff's direct supervisors. Van Patten and Ihrke were responsible for scheduling in the Animal Care Department, which included assigning animal care workers to outbuildings. During her tenure in the Animal Care Department, Kirchhoff has worked every route Van Patten has assigned to her. She has never requested to be kept off the schedule for any specific route because of the difficulty of the work. Van Patten has not scheduled Kirchhoff for light duty or easier jobs more often than her coworkers and he evenly rotates the job assignments among all workers in the department.

Although there are no assigned seats in the Animal Care Department, employees usually sit in the same seat during breaks and when receiving assignments from supervisors. When Kirchhoff first started working in Animal Care, Jeff Spencer, a coworker, was seated ahead of Kirchhoff. Later in 1997, Spencer moved his seat to a table next to Kirchhoff at which he was facing her all of the time.

In February of 1998, Tom Dinka, a coworker, reported to LeeAnn Ihrke, a supervisor in the Animal Care Department, that while he was working in the Cal Bio building with Kirchhoff that he had observed Jeff Spencer staring at Kirchhoff through the office's windows. Spencer had no supervisory duties regarding Kirchhoff and was not responsible for her work performance.

In response to Dinka's report, Ihrke asked Kirchhoff about Spencer's reported behavior. Ihrke told Kirchhoff that Fort Dodge Animal Health was required by law to follow up on Dinka's report. In February of 1998, Kirchhoff reported the following to Ihrke: that in 1997, Spencer told Kirchhoff that she "ought to think about bidding out" of the department, but Spencer didn't threaten her or act in a hostile or abusive manner at that time; that in 1997, Kirchhoff overheard a telephone conversation between Spencer and his wife in which he called his wife a "stupid bitch"; that in 1998, Spencer had been following Kirchhoff; that in 1998, Spencer was out of his assigned work area; that in 1998, Spencer had yelled at Kirchhoff that she wasn't doing her job; that in 1998, Spencer had yelled to Kirchhoff's coworkers that they were doing all the work and that their backs must be hurting from carrying Kirchhoff all day; that in 1998, Spencer had watched Kirchhoff while she worked; that in 1998, while Kirchhoff was loading a truck, Spencer stood approximately 100 yards away and yelled, "What the fuck is

taking you so long?", "What the fuck are you doing?" and "Jesus, you're slow."

In response to her discussion with Kirchhoff, Ihrke sent Kirchhoff to meet with Craig Wood, then the Human Resources Director at Fort Dodge Animal Health. In February of 1998, Kirchhoff reported to Wood the same information she had previously reported to Ihrke. Wood told Kirchhoff that she was not at fault, that she was doing a fine job and that Spencer's behavior would be investigated. Kirchhoff's meeting in February 1998, with Wood, was the first time that she had reported Spencer's behavior to the Fort Dodge Animal Health's Human Resources Department since starting her employment there.

Prior to her reporting to Ihrke and Wood, Kirchhoff secretly tape recorded a conversation she had with Spencer in which Spencer had detailed his complaints with Kirchhoff. In response to Kirchhoff's telling Spencer to stop his harassment of her, Spencer told Kirchhoff that "[a]ll I want you to do is your job and come to work on time." At no time during this conversation does Spencer explicitly indicate that his behavior toward Kirchhoff is motivated by her gender. Kirchhoff describes Spencer as being a "very good worker" and that Spencer is "...pretty intense. He's kind of a perfectionist." Wyeth App. at 73, Kirchhoff Dep. at 100.

Bill Ewing, a coworker of both Spencer and Kirchhoff, testified that "Jeff Spencer would do that to anyone in the department. If you're not pulling your weight, he's going to let you know it, confront you, as the rest of us would to one another." Wyeth App. at 102, Ewing Dep. at 57. Ewing also stated that "[Spencer] was over critical with everyone's work, whether it was Shelly or Terry Gillespie or Phil Pingel or whoever it might be. You know, I mean, he was just kind of a perfectionist

when it came to work. I mean he was a hard worker and he was probably the best worker in the department." Wyeth App. at 103, Ewing Dep. at 113. Ewing testified that he believed that Kirchhoff had a reputation for being a sloppy worker. On the other hand, Ron Thoma, another co-worker of Spencer and Kirchhoff, described Spencer as "a good worker, a gunner." Wyeth App. at 99, Thoma Dep. at 64. Yet another co-worker, John King, testified that he found Kirchhoff to be a "lazy worker." Wyeth App. at 96, King Dep. at 112.

Following Kirchhoff's complaint in February of 1998, Spencer asked his supervisor Ihrke to check his file. Ihke did not find any notices of discipline or any indication that a complaint had been lodged against him. After February of 1998, Kirchhoff discussed Spencer's actions toward her with Ihrke. On one occasion, Kirchhoff told Ihrke that Spencer "was just getting weird again." Wyeth App. at 76, Kirchhoff Dep. at 125. Ihrke asked Kirchhoff, "What do you want me to do, do you want me to talk to him?" Wyeth App. at 76, Kirchhoff Dep. at 125. Kirchhoff responded by saying, "No, I will try to work this out." Wyeth App. at 76, Kirchhoff Dep. at 125.

On March 17 and 18, 1998, Fort Dodge Animal Health provided Equal Employment Opportunity, Affirmative Action and Sexual Harassment Awareness Training to employees of Fort Dodge Animal Health. The training was provided to all Fort Dodge Animal Health employees, including, but not limited to, those employees in the Animal Care Department, which included Jeff Spencer and Shelly Kirchhoff.

In August of 1998, after a weekend golf tournament, Kirchhoff, her sisters and their husbands, went to a local establishment in Livermore. Spencer showed up there and attempted to talk to Kirchhoff, her sisters and their husbands. The situa-tion made Kirchhoff uncomfortable, so her party left and went to a bar in Humboldt, Iowa, called the Knotty Pine. Spencer then showed up at the Knotty Pine and approached Kirchhoff, telling her that he wanted to "bury the hatchet" between them. During their conversation, Spencer related to Kirchhoff that his daughter had Down's Syndrome and told her that he wanted to "go back to work on Monday and tell LeeAnn that I want to work with you more." Wyeth App. at 75, Kirchhoff Dep. at 118. On the following Monday morning, Spencer told Ihrke that he wanted to "bury the hatchet" with Kirchhoff and wanted to be scheduled with her more often. Ihrke consulted Kirchhoff regarding Spencer's request. Kirchhoff requested that Ihrke not schedule her to work more often with Spencer.

After Spencer's attempt to "bury the hatchet" in August of 1998, Kirchhoff found that Spencer "was good for a while," and that he quit glaring at her, stopped making comments about her in the lunchroom, stopped driving by and yelling things at her, and "just wasn't on my case so much every day . . ." Wyeth App. at 76, Kirchhoff Dep. at 123. However, in December of 1998, while Kirchhoff was loading a truck, Spencer stood approximately 100 yards away and watched her for ten minutes.

During 1999, Kirchhoff estimates that she worked on a team with Spencer between two and five times. Although unsure of the number of times, in 2000, Kirchhoff estimates that she worked on a team with Spencer between two and five times. Kirchhoff would have contact with Spencer on those days in which they were both working when all the Animal Care workers would gather at the central meeting place in the Animal Care lunchroom for their designated 15 minute breaks at 9:30 a.m., 10:45 a.m. and 2:30 p.m. The

Animal Care workers would also gather at the Animal Care lunchroom for their 30 minute lunch break at 11:55 a.m.

In 1999, Kirchhoff suffered work-related injuries and, as a result, she was not in the Animal Care Department from approximately January 1999 through July 1999. When Kirchhoff returned to Animal Care in July 1999, Spencer's behavior was appropriate until August of 2000. Spencer then began making comments out loud in front of Kirchhoff's coworkers, about the male coworkers' backs hurting because Kirchhoff was not carrying her weight and that her coworkers would have to do all her work for her.

In August of 2000, Spencer drove continuously past an area where Kirchhoff and a male coworker were operating a skidloader. On each pass, Spencer would stare out the window at Kirchhoff and shake his head. Later that day, Spencer yelled at Kirchhoff because he thought she was not running the skidloader and was making the male coworker run the machine. This was not true, as Kirchhoff had operated the skidloader during the morning hours. On another occasion, Kirchhoff's supervisor had assigned her and Gary Fox to load hay bales. Fox took the keys and began using the tractor to load the bales of hay. Spencer approached and began yelling at Fox, "see you're doing her work-you're doing her work for her again." Wyeth App. at 80, Kirchhoff Dep. at 151. Even after Fox told Spencer that it was not a big deal, Spencer persisted.

In October of 2000, the Animal Care Department opened a new facility for poultry. Positions in the new facility were desirable since they did not require working weekends, the work was indoors and the assignment was long term. There were some disputes between the workers as to who should get the position and the union became involved. Spencer blamed Kirchhoff for the disputes.

Spencer told Phil Pingel that Kirchhoff was not pulling her weight. Pingel responded by telling Spencer that this was not true, that he had worked with Kirchhoff many times and that she performed her duties and pulled her weight. Spencer told Pingel that he thought women could not work like he worked and that if he had to carry a woman's work load then he should get her pay.

On October 23, 2000, Kirchhoff was scheduled to work with Spencer and Ron Thoma on the south route. The normal procedure is for the three people on the south route to ride down together in the same truck and work as a team to complete the job. On this occasion, Spencer and Thoma took one truck and left Kirchhoff to drive down separately. The three did not work as a team. Rather, Spencer and Thoma "just did their own thing in the Doghouse." Wyeth App. at 80, Kirchhoff Dep. at 152.

On October 24, 2000, Kirchhoff reported to Ihrke that Spencer "was back at it again...[with] the yelling and the comments." Wyeth App. at 76, Kirchhoff Dep. at 123. Kirchhoff told Ihrke that she wanted Ihrke to take action on her complaint. Ihrke responded by contacting the Human Resources Department.

On October 27, 2000, Kirchhoff met with Tim Carlson, Fort Dodge Animal Health's Human Resources Director. Also present at the meeting was LeeAnn Ihrke, Myles Van Patten and Janet Hearn, Kirchhoff's union representative. Among the things that Kirchhoff reported were: (1) the events following the golf tournament, including the fact that Spencer had followed Kirchhoff to two bars and had eventually talked to Kirchhoff and told her that he had an interest in working with her more often; (2) that Dave Fogelman, another Animal Care worker, told Kirchhoff that just before she came to Animal Care,

Spencer had said to Fogelman that a woman coming out in the department would change everything; (3) a conversation between Spencer and Kirchhoff that had occurred when Kirchhoff was still in her probationary period in which Spencer had told Kirchhoff to consider whether this was what she wanted to do until she was 50; (4) snide remarks by Spencer to Kirchhoff's coworkers about how their backs must be tired from carrying her all day; (5) a time when Spencer blocked her path with a truck he was driving when she was practicing on the sander; (6) that Kirchhoff had tape recorded a conversation between her and Spencer because she was concerned for her safety; (7) a time that Spencer was staring through a window at Kirchhoff while she was working in Cal Bio with Tom Dinka and that Dinka had reported Spencer; (8) an incident in which Spencer stood in the dark glaring at Kirchhoff through the washroom window while Kirchhoff was working in the rabbit building and other instances in which her coworkers had told her that Spencer was watching her and she had been unaware of it; (9) a time when Kirchhoff was loading the north route truck and Spencer yelled, What the fuck is taking you so long"; (10) that Fogelman had told her that Spencer talked about her constantly; (11) that her coworkers told her that Spencer would "obsess" about her; (12) that Spencer would call Kirchhoff the "girlfriend" of the other men who worked with her; (13) that Kirchhoff was worried that Spencer would try and set her up; (14) that when she was working with Spencer and Thoma on the south route they left without her and she had to take her own truck; and, (15) that Kirchhoff's coworkers had told her that they had told Spencer to get over it and to leave Kirchhoff alone. This October 27, 2000, meeting with Carlson was the first time Kirchhoff had made a report regarding Spencer's actions in 2000 to someone in the Human Resources Department.

On October 30, 2000, a meeting was held to discuss the apparent personality conflict between Kirchhoff and Spencer. Present at this meeting were Carlson, Kirchhoff, Spencer, Janet Hearn, Miles Van Patten and David Higgins. The purpose of the meeting was to give Kirchhoff and Spencer an opportunity to speak their concerns and to get the issues out in the open and resolved. During the meeting Spencer was told that it was not his responsibility to supervise Kirchhoff. Spencer was informed by Fort Dodge Animal Health at the end of the meeting that if his behavior did not improve there would be "zero tolerance."

During the meeting on October 30, 2000, Carlson indicated to Kirchhoff that he had enough information then to terminate Spencer's employment. Kirchhoff responded by telling Carlson, "You can't." When asked why couldn't Carlson fire Spencer, Kirchhoff stated that he couldn't fire Spencer because Spencer had a daughter with Down's Syndrome that he supported and that he needed his job and the insurance that went with it. Wyeth App. at 90, Kirchhoff Dep. at 202. Carlson never made a notation of any kind in Spencer's personnel file regarding the meeting or about the "zero tolerance" warning.

After the meeting on October 30, 2000, Van Patten and Ihrke attempted to arrange the work schedule such that Spencer and Kirchhoff would not be placed on the same team. During 2001, Kirchhoff estimates that she worked on a team with Spencer one or two times.

Following the October 30, 2000 meeting, Kirchhoff's supervisor, Myles Van Patten did not follow up with Kirchhoff to determine whether her problems with Spencer were ongoing. Van Patten thought that LeeAnn Ihrke was checking with Kirchhoff to determine whether she was having any ongoing problems with Spencer.

Kirchhoff indicated that Spencer would do things indirectly such as treat the people with whom she worked badly.

Shortly after the October 30, 2000 meeting, Jim Fleming told Kirchhoff that he would counsel Spencer and drive him down the road to calm him down. Fleming said that Spencer was holding his head in his hands, rocking back and forth, and stating that he could not quit thinking about Kirchhoff, that she gave him migraines and that someone needed to do something about her. Fleming told Spencer that he needed to get some help.

On March 7, 2001, employee training for the Animal Care Department was provided, which included review of the Bargaining Unit Employee Handbook and covered the sexual harassment policy and complaint procedure at Fort Dodge Animal Health.

On May 19, 2001, Kirchhoff came in the back door of the Animal Care break room. When she came in, Spencer was leaning against the time clock with his arm and he was looking down the hallway toward her. Rather than have a confrontation, Kirchhoff turned around and went into the locker room, resulting in her punching in two minutes late. Kirchhoff told her supervisor LeeAnn Ihrke about this event. In May of 2001, Kirchhoff was sitting on a picnic table during break when Spencer came out of the break room and got into a truck with Rick Jones, looked back at Kirchhoff, floored the gas on the truck causing it to spin its tires and shoot rocks up at Kirchhoff.

On June 17, 2001, Kirchhoff was scheduled to work in Control. After looking at the publicly posted schedule, Kirchhoff realized that Spencer would be working in the same area the following day. As a result, Kirchhoff took Kenny Rose and Phil Pingel down to Control and showed them the area. They commented on how nice the place looked. Based on his obser-

vations, Pingel found the mouse feeders and water containers to be full. The next day, June 18, 2001, during break, Kirchhoff and a coworker pulled up to the break area in a truck, and Spencer was in the truck ahead of them. When Kirchhoff parked, Spencer walked up to the passenger window of the truck and stated that Kirchhoff did not do her job down in Control and that she had starved the mice and hamsters and did not provide water for the animals. Spencer indicated that a technician had turned her in and that she was getting "written up." Spencer proceeded into the lunchroom and publically announced to the group of Animal Care workers present that Kirchhoff was lazy and had not properly fed and watered the mice in Control and that she was going to get a pink slip. Pingel told Spencer that he and Rose had checked Kirchhoff's work the day before and the mice were all properly fed and watered. Spencer still reported to Ihrke that Kirchhoff had not fed the mice and that the food and water containers were completely empty. The feed containers are large and hold about two full hand-fulls of kibble. There is a requirement that the maximum number of mice per cage cannot exceed ten or eleven. Because of the size of the feed containers and the number of mice allowed per cage, if the food and water containers are filled in the mouse cages, it is not possible for them to become empty within twenty-four hours.

On June 18, 2001, Kirchhoff reported to Ihrke that Spencer had resumed glaring at her during work. Kirchhoff told Ihrke that Spencer had informed her that she hadn't done her job properly in Control the day before, that she had starved the mice and hamsters and had failed to properly water the animals. Spencer had reported to Ihrke earlier that day that he had been instructed to bring his concerns regarding Kirchhoff to management and

that he believed that Kirchhoff had neglected to properly feed and water the animals the previous day. Pingel told Ihrke that he and Rose had checked the mouse cages and found that they had food and water. Pingel also told Ihrke that he had told Spencer this. Ihrke followed up on Spencer's report by asking a technician about the condition of the site. Ihrke determined that Kirchhoff's work in the Control area was acceptable and informed Spencer that in Ihrke's estimation, Kirchhoff probably had not filled the food containers as high as on some other days and that the mice had probably eaten it down. Ihrke did not perceive Spencer's June 18, 2001, report regarding the mice to be harassment or sex-based harassment toward Kirchhoff. Ihrke understood Spencer to have done as directed, to use the proper channels to report his concerns regarding Kirchhoff's work with the mice. Kirchhoff reported in her journal that, in a notation dated June 18, 2001, that Spencer "hadn't really spoken to [her]" since the meeting on October 30, 2000.

On July 16, 2001, when Kirchhoff was working with John Fischer in Cal Bio, Spencer began yelling at Fischer. Later that day, Spencer kept driving past the location where Kirchhoff and Fischer were working, hung his head out the window watching them and looked at his watch periodically. Fischer made a comment to Kirchhoff that he was really going to get laid into in the shower that night by Spencer because he had been working with Kirchhoff.

On July 31, 2001, Kirchhoff and Fogelman were scheduled to work in the LAC building. The workers from the previous shift told them that the tires were flat on the wheelbarrow and they needed to get an air tank from maintenance to fill the tires. Fogelman went to maintenance and returned to the LAC building with an air tank but he failed to check and see if it had adequate air pressure. That afternoon, Kirchhoff's supervisor told her to leave the LAC building and to work the south route. Because Spencer was working the south route, Fogelman and Kirchhoff decided that it would be best if Fogelman worked the south route because Kirchhoff was uncomfortable working with Spencer. When Kirchhoff went to fill the tires on the wheelbarrow the air tank had insufficient pressure to fill the tires. Because Kirchhoff had to work the remainder of the day alone in the LAC building, she did not have time to return to maintenance to have the air tank filled so she could inflate the tires on the wheelbarrow. At the end of the day, Kirchhoff told Ihrke that the next shift at the LAC building would have to take the air tank to maintenance and get it filled to inflate the tires.

On August 1, 2001, two male Animal Control workers were assigned to the LAC building. They did not return the air tank to maintenance and did not inflate the wheelbarrow's tires. On August 2, 2001, Terry Gillespie was working in the LAC building with Spencer. The wheelbarrow did not have air in its tires. Spencer was furious about it and yelled in reference to Kirchhoff, "I can't believe that dumb fucking bitch does not know how to run this air tank." Gillespie told Kirchhoff what Spencer had said. Although two male Animal Care workers who had worked in the LAC building after Kirchhoff, Spencer did not blame them for not filling the wheelbarrow tires with air even though they were the last workers in the building. Nor did Spencer blame Fogelman, who had worked part of the day with Kirchhoff, even though it was his failure to check the pressure in the tank before he retrieved it from maintenance that made it impossible for Kirchhoff or anyone, to fill the wheelbarrow's tires. Although he was not present for the incident, Pingel heard what Spencer had said about Kirchhoff. Pingel

told Ihrke and Van Patten about the incident with Spencer and the air tank. Pingel then requested to leave his present duties and go fill the air tank since it had not yet been done and he was working in that area later. Later that day, Spencer glared at Kirchhoff during break time.

Spencer did criticize the work of the male workers in Animal Care. The severity with which he criticized some male workers differed from the way he criticized Kirchhoff. Ewing testified that when Spencer would point out a problem with his work he did not yell at him and never told him that he should bid out of the department or leave the department because he was not performing his work. Similarly, Blankenburg testified that when Spencer brought to his attention a problem with his work, Spencer did not yell at him or ever tell him to bid out of the department. While Spencer thought that Steve Barlow should have been fired because of his absences from work, failure to call in, and his leaving in the middle of a shift and not returning, Spencer never told Barlow to bid out of the department nor did he ever tell Barlow that he wasn't carrying his weight. Gillespie observed that Spencer would yell out the truck window at Kirchhoff but he did not see Spencer yell out the window when he was working with male employees.

On August 16, 2001, Kirchhoff filed a complaint against Spencer with Ihrke. Kirchhoff made the complaint after learning of a comment allegedly made by Spencer to Steve Barlow, which was relayed to Pingel who in turn told Kirchhoff. At the time she made the complaint, Kirchhoff understood the comment to be a threat to burn down Kirchhoff's house and to harm her family. On August 16, 2001, Kirchhoff, accompanied by her supervisor, Ihrke, met with Kristina Hoffmann, the Human Relations Manager at Fort Dodge Animal Health, to report that Spencer had resumed following Kirchhoff and staring at her. At this time, Kirchhoff alleged that on one occasion Spencer had checked up on and criticized Kirchhoff's work with the mice, that on another occasion Spencer had criticized Kirchhoff's failure to refill an air tank and referred to her as a "stupid bitch" or a "dumb fucking bitch" to a coworker, and that on another occasion Spencer had allegedly spun the tires on a truck which caused gravel to be sprayed towards Kirchhoff and other employees. Kirchhoff reported that she felt threatened by Spencer's alleged statement to Barlow in which he threatened to burn down Kirchhoff's house and to harm her family. Kirchhoff also reported: that Spencer had told her to bid out and that she could not do her job; that Spencer had told Fogelman that he was having a tough time having a woman out there in Animal Care; that Spencer had told Fleming that he gets bad headaches thinking about Kirchhoff; that after the meeting with Spencer in 2000, she had slept with a scissors and hammer in her bed; and, that she thought Spencer was critical of her work because she was a woman. Hoffmann responded to Kirchhoff's allegations by launching an investigation.

During the investigation, Hoffman found that various Animal Care workers confirmed what Kirchhoff had told Hoffman, including the following: that Spencer called Kirchhoff a worthless stupid bitch; that Spencer made excuses to check Kirchhoff's work and watched her more closely than anyone else; that Spencer was critical of other male workers' performance when they worked with Kirchhoff; that Spencer wanted Kirchhoff out of the department; that Spencer had a problem with women; and, that Spencer was told by a coworker that he had a problem and to stop policing Kirchhoff.

During her investigation, Hoffman interviewed sixteen of twenty-two workers in the Animal Control Department. Hoffman asked Spencer for the names of those Animal Care workers who could corroborate his side of the story.

After conducting an investigation into Kirchhoff's complaints against Spencer, Hoffman made a report and recommendation to Human Resources Director Carlson. Hoffman recommended that Spencer's employment at Fort Dodge Animal Health be terminated because Spencer had created a hostile work environment for Kirchhoff and other employees in violation of the "zero tolerance" warning he had received in October of 2000.

Based on Hoffmann's investigation, Carlson understood that employees other than Kirchhoff had been subjected to a hostile work environment by Spencer. Carlson believed that Spencer had also created a hostile work environment for Terry Gillespie, Phil Pingel, and Dave Fogelman. Gillespie reported to Hoffman that Spencer had been "on my ass" since he started to work in Animal Care but that when Terry Gillespie worked with Kirchhoff, Spencer would be especially critical of Gillespie's work and make comments such as, "How's it going working with your girlfriend." EEOC App. at 165, Gillespie Aff. at 2.

Fogelman similarly reported that Spencer watched him more when he was working with Kirchhoff. Fogelman reported feeling threatened by Spencer and feared how Spencer would react if he discovered that Fogelman was speaking with Hoffman. Fogelman also reported that Spencer made him feel uncomfortable working in the Animal Care Department, in part because when he worked with Kirchhoff he felt he was watched more by Spencer. Fogelman told Hoffman that Spencer had taken a swing at him and that Spencer had threatened to "beat [his]

ass." Wyeth App. at 133, Hoffman Dep. at 92. Fogelman told Kirchhoff that he had been harassed by Spencer, and referred to Spencer as "a bully." Wyeth App. at 65, Kirchhoff Dep. at 65.

Kirchhoff was aware that Spencer had harassed Ron Thoma, Jim Stringer and Ray Williamson. Kirchhoff wrote in her journal that Williamson told her that on one occasion Spencer had pushed Williamson against a wall and threatened to "burn his fucking house down!" Wyeth App. at 186, Kirchhoff Journal at 3. Kirchhoff also wrote in her journal that Stringer had told her that on one occasion Spencer had threatened to "burn his house down." Wyeth App. at 186, Kirchhoff Journal at 3.

On August 22, 2001, Kirchhoff met with Ihrke and Hoffmann and reported that there had been no retaliation from other employees and that the work environment in the Animal Care Department was "no more uncomfortable than usual." Wyeth App. at 145, Hoffman Dep. at 173. On August 24, 2001, Spencer's employment with Fort Dodge Animal Health was terminated for creating a hostile work environment in violation of the "zero tolerance" warning he received regarding his behavior in October of 2000. At the time of Spencer's termination, Carlson and Hoffman did not view the hostile work environment created by Spencer toward Kirchhoff to be based on her sex or gender. Rather, Carlson, Hoffman and Ihrke viewed the situation as a personality conflict between two people. Carlson understood that Spencer had created and generated a hostile work environment which he understood to be a violation of company policy.

Before terminating Spencer, Hoffman was instructed by Carlson to get a recommendation from Ihrke, Van Patten and Kim Gugisberg, Ihrke's and Van Patten's supervisor. Van Patten, Ihrke and Gugis-

berg recommended that Spencer be transferred to a different department rather than be terminated. Van Patten did not agree with Fort Dodge Animal Health's decision to terminate Spencer.

Other than Spencer's problems with Kirchhoff, Spencer had no reported problems working with women dating back to August 10, 1987, when he first started to work at Fort Dodge Animal Health. Ihrke, Spencer's supervisor in the Animal Health Care Department since 1992, testified that during her employment at Fort Dodge Animal Health as a Veterinary Technician from 1990 to 1992, she worked with Spencer at least one or more times a month. In her capacities as a Veterinary Technician and later as Spencer's supervisor, Spencer never mistreated her or failed to treat her with respect. While employed as a Veterinary Technician, Ihrke never saw Spencer discriminate against or harass a woman. Besides Ihrke, there were other female vet techs who worked with Spencer on a regular basis, none of whom complained about Spencer either formally or informally.

In 1992, when Ihrke became a supervisor in the Animal Care Department, another female employee, Pam Moeller, worked in the general rotation of Animal Care Department workers. As an Animal Care worker, Moeller had occasion to work with Spencer. Moeller never made any formal or informal complaint against Spencer to Ihrke. Moeller stated that while working in the general rotation in the Animal Care Department, from 1989 to May of 1996, that:

> [A]t no time did [Spencer] treat me with disrespect or subject me to inappropriate behavior. He did not harass me or treat me poorly. He never made any comments in my presence that he believed a woman could not perform the duties and responsibilities of a Responsible Animal Caretaker, nor did he make

> any statements that a woman should not be paid the same as a man or a woman was unable to do a man's job. In fact, at no time did he ever make statements in my presence that would indicate that he had any bias toward me because I was a woman or toward women in general.

Wyeth App. at 197–98, Moeller Aff. at 1–2.

From 1990 to 1995, Vickie Hall had occasion to work with Spencer a couple times each month in her capacity as a research scientist. Hall stated that Spencer never treated her with disrespect and that, while she worked in the area of Animal Care, she was unaware of any instances in which Spencer mistreated any female employee in any way.

Following his termination, Spencer filed a grievance with the union, challenging his termination pursuant to the collective bargaining agreement between the union and Fort Dodge Animal Health. Spencer's grievance led to the scheduling of arbitration. Prior to the date on which the arbitration was to take place, Fort Dodge Animal Health settled with Spencer. Under the terms of the settlement, Fort Dodge Animal Health agreed to pay Spencer a sum of money and in return eliminated the possibility that Fort Dodge Animal Health could be compelled by the outcome of the arbitration proceeding to reinstate Spencer.

Following Spencer's termination, Rick Jones, John King, and Bill Ewing told Ihrke that they were uncomfortable working with Kirchhoff because they were afraid they would lose their jobs if they worked with her. Ihrke took those concerns to Hoffman. Jones, King and Ewing were never scheduled to work with Kirchhoff again. Prior to Spencer's termination, Ewing worked on the same team as Kirchhoff approximately three times a month. Ron Thoma has not worked with

Kirchhoff on the same team since the termination of Spencer. After Spencer's termination, King has not engaged Kirchhoff in any small talk. Jones has not talked to Kirchhoff when she comes to work. Those men who did not associate themselves with Kirchhoff were called the "brotherhood" by their coworkers.

After Spencer was fired, Ron Thoma would sit in the seat previously occupied by Spencer and for a period of time turned the chair around so that his back faced his supervisors when they were giving out instructions for the day. Neither supervisor instructed him to stop this practice.

On August 31, 2001, following Spencer's firing, Kirchhoff went to Hoffman to express her concerns regarding the atmosphere in the Animal Care Department. Kirchhoff was concerned that her coworkers in the Animal Care Department were not talking to her. In response to Kirchhoff's concerns, Hoffman explained to Kirchhoff that it might take some time for the atmosphere in Animal Care to return to normal after the termination of a longtime employee such as Spencer. Hoffman told Kirchhoff that Fort Dodge Animal Health expected her coworkers to communicate with her regarding work matters and that they were at all times to treat her with respect. Hoffman directed Kirchhoff to report to Human Resources, Van Patten or Ihrke any behavior that did not conform to this standard.

In early September of 2001, Hoffman went out to speak with employees in the Animal Care Department who had requested to speak to her regarding their concerns and fears about working with Kirchhoff. After this meeting in early September of 2001, Hoffman met with Ihrke and decided to call a meeting with the entire Animal Care Department to communicate Fort Dodge Animal Health's expectations of the Animal Care workers. Hoffman conducted the meeting and informed the workers that she would not discuss the specifics of the termination of Spencer. After addressing the entire Animal Care Department in September of 2001, Hoffman met with Ihrke and Van Patten and instructed them to keep an eye on the atmosphere in the Animal Care Department, monitor how employees were interacting with Kirchhoff and to report any inappropriate behavior.

After September of 2001, Van Patten and Ihrke decided it would be best for the department not to schedule workers together who were uncomfortable with each other in order to "try to diffuse the situation." Wyeth App. at 150, Ihrke Dep. at 85. Management in the Animal Care Department has, in the past, refrained from scheduling workers together when there has been a dispute, but this type of scheduling has not been made permanent.

On October 10, 2001, Tim Carlson held a meeting attended by Human Resources, management, Animal Care workers and union representatives. Among those in attendance at this meeting were LeeAnn Ihrke, Dick Crouse, Jeff Ashenfelter, David Higgins, Steve Barlow, Terry Gillespie, Dave Fogelman, Kristina Hoffman, Chris Albrecht, Ray Williams and Jim Fleming. This meeting was held pursuant to a collective bargaining agreement between the union and Fort Dodge Animal Health, which required Fort Dodge Animal Health to reconsider Spencer for employment. The union, on Spencer's behalf, was given an opportunity to question some of the Animal Care workers. Carlson took this opportunity to explain to the union representative the circumstances surrounding Spencer's termination and to clarify that "the situation between Mr. Spencer and Ms. Kirchhoff was beyond just being a situation between Ms. Kirchhoff and Mr. Spencer...that there were others in the area that were concerned

about working around Jeff." Wyeth App. at 118, Carlson Dep. at 142.

In October of 2001, the union, acting on Spencer's behalf, attempted to reach an agreement with Fort Dodge Animal Health under the terms of which Spencer would be reinstated to work at Fort Dodge Animal Health's Riverside facility. Kirchhoff expressed to Carlson and Hoffman that she would not be comfortable with Spencer returning to work at Fort Dodge Animal Health in any capacity. Hoffman informed Carlson that as Human Resources Manager at Fort Dodge Animal Health, she opposed Spencer's proposed reinstatement, stating that his behavior could not be condoned by Fort Dodge Animal Health, and that even if he was to be placed in another department or at another site, Fort Dodge Animal Health could not be assured that his behavior wouldn't recur. Hoffman stated that "we have an obligation to our other employees." Wyeth App. at 141, Hoffman Dep. at 147. It was determined that Spencer's return would not be in the best interests of Fort Dodge Animal Health and Spencer was not rehired by Fort Dodge Animal Health.

On December 11, 2001 through December 18, 2001, Fort Dodge Animal Health provided a Respect for People Training program. Employees of Fort Dodge Animal Health who participated included Charlie Blankenburg, Dave Fogelman, LeeAnn Ihrke, Ron Thoma, Jeff Ashenfelter, John King, Gayle Ruthart, Jim Fleming, Bill Ewing, Myles Van Patten, Steve Barlow, Rick Jones, and Randy Berg.

On December 17, 2001, Kirchhoff filed a charge of discrimination with the Iowa Civil Rights Commission and the EEOC alleging that Fort Dodge Animal Health discriminated against her on the basis of sex and retaliation. Kirchhoff was on leave from her employment at Fort Dodge Animal Health from December 4, 2001 to January 17, 2002. Immediately prior to

Kirchhoff's return from this leave of absence, on January 9, 2002, Hoffman met with the Animal Care workers to reiterate Fort Dodge Animal Health's expectations regarding their treatment of Kirchhoff. Present at this meeting on January 9, 2002, were Hoffman, Ihrke, Chris Albrecht, Ron Thoma, Charlie Blankenburg, John King, Gayle Ruthart, Randall Berg, Richard Jones and Jim Fleming. Some of the Animal Care workers informed Hoffman that they had learned from Jim Fleming, an Animal Care worker and union Steward, that their names had been mentioned in an EEOC complaint against Fort Dodge Animal Health and expressed their concerns about working with Kirchhoff upon her return from leave.

After the meeting on January 9, 2002, Jim Fleming, the Animal Control worker and union steward, who had obtained a copy of the EEOC complaint from Spencer and had shared the information contained in that document with the Animal Control workers named in it, was issued a letter of policy violation by Fort Dodge Animal Health for his behavior. The letter from Human Resources to Fleming stated in part:

> [Y]ou admitted to sharing information from Jeff Spencer's copy of the EEOC charge with fellow Animal Care employees. You attended Respect for People Training less than a month ago, where you were trained on keeping information on an investigation confidential.
>
> By doing this you violated the confidentiality of the investigation, exasperated the employee relations in the department, and compromised the work environment of the department... As an employee of Fort Dodge Animal Health this behavior will not be tolerated. Please understand that any future viola-

tions will result in discipline up to and including termination.

Wyeth App. at 168, letter at 1.

On September 18, 2002, the EEOC filed a complaint against Fort Dodge Animal Health, alleging that Fort Dodge Animal Health discriminated against Kirchhoff by (1) subjecting her to a hostile work environment based on her sex, and (2) subjecting Kirchhoff to retaliation by coworkers in response to her complaint regarding the hostile work environment. On September 19, 2002, an article was published in the Fort Dodge Messenger announcing the EEOC's lawsuit against Fort Dodge Animal Health. The Messenger article was based upon a press release written and released by the EEOC, which specifically named Kirchhoff and described her allegations of sex-based discrimination and coworker retaliation. On September 20, 2002, in response to the EEOC's public announcement of the charges made by Kirchhoff, Dr. Vicki Hall, Vice President of Operations at Fort Dodge Animal Health spoke with and presented a memo to the workers in the Animal Care Department at Fort Dodge Animal Health. The purpose of this meeting was to reiterate to the workers in the Animal Care Department, who had been informed of Kirchhoff's allegations by the EEOC's press release the previous day, Fort Dodge Animal Health's policy that they were expected "to treat Shelly cordially, as you would treat any other employee." Wyeth App. at 166, memorandum at 1.

Each and every time that Hoffman spoke with Kirchhoff, Hoffman gave Kirchhoff an opportunity to present any complaints she may have had about her working environment. Kirchhoff never reported to Hoffman that her coworkers had refused to ride with her in a pickup truck at work. Kirchhoff never reported to Hoffman that a coworker had refused to pick her up and give her a ride at work.

From 1997 to the present, Kirchhoff has remained in the same position, her job duties have not changed, her pay has never been reduced, she has received regular raises in pay and vacation days, and her medical leave has been fully accommodated. Kirchhoff's personnel records indicate that her work performance in the Animal Care Department has been adequate from 1997 to the present.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

**Rule 56. Summary Judgment**

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary

judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

### 2. *The parties' burdens*

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see*

*also Rose–Maston*, 133 F.3d at 1107; *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same).

### 3. *Summary judgment in employment discrimination cases*

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v.*

*Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson*, 931 F.2d at 1244); *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford*, 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow*, 128 F.3d at 1205

("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford*); *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford*, 37 F.3d at 1341); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford*, 37 F.3d at 1341); *Johnson*, 931 F.2d at 1244.

■ However, the Eighth Circuit Court of Appeals also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[1] Thus, what the plaintiff's evi-

1. In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law *after* a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for

judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

dence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097 (emphasis added). The court will apply these standards to defendant Wyeth's Motion for Summary Judgment.

### B. Sexually Hostile Work Environment

Defendant Wyeth seeks summary judgment on plaintiff EEOC's claim that Kirchhoff was subjected to a sexually hostile work environment. Defendant Wyeth argues that it is entitled to judgment as a matter of law on the EEOC's hostile work environment claim on the grounds that any harassment Kirchhoff suffered was not based on her sex, did not effect a term or condition of employment, and was unknown to defendant Wyeth.

The EEOC's hostile work environment claims are evaluated under the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 2004 WL 202999, at *3 (8th Cir.2003) (citing *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1156 (8th Cir.1999)). Under this framework, the plaintiff first must demonstrate a prima facie case of discrimi-

nation. *Erenberg*, 357 F.3d 787, 2004 WL 202999, at *3; *Breeding*, 164 F.3d at 1156. If the plaintiff can establish a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscrimatory reason for its employment decision. *Erenberg*, 357 F.3d 787, 2004 WL 202999, at *3; *Breeding*, 164 F.3d at 1157. If the employer successfully articulates a non-discriminatory reason, then the burden shifts back the plaintiff to show the employer's stated reason was a mere pretext for discrimination. *Erenberg*, 357 F.3d 787, 2004 WL 202999, at *3; *Breeding*, 164 F.3d at 1158.

The elements of the EEOC's claim of a sexually hostile work environment are the following: (1) that Kirchhoff is a member of a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment, but failed to take prompt remedial action. *See Erenberg*, 357 F.3d 787, 2004 WL 202999, at *4; *Jacob–Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir.2002); *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 755–56 (8th Cir. 2001); *Bogren v. Minnesota*, 236 F.3d 399, 407 (8th Cir.2000), *cert. denied*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Stuart v. General Motors Corp.*, 217 F.3d 621, 631 (8th Cir.2000); *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999); *see also Beard v. Flying J. Inc.*, 266 F.3d 792, 797 (8th Cir.2001) (mentioning only the first four elements); *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 736 (8th Cir. 2000) (same). The parties do not dispute that the EEOC can establish the first two elements-that Kirchhoff is a member of a protected group and that she found the

250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, the standards articulated

in *Reeves* are applicable to the present motion for summary judgment.

behavior unwelcome. The remaining three elements are disputed by defendant Wyeth. The court will address each of the three remaining elements in turn.

### 1. Harassment based on sex

Defendant Wyeth argues that the EEOC cannot establish that Spencer's harassing conduct toward Kirchhoff was based on her sex. In essence, defendant Wyeth argues that Spencer was an equal opportunity harasser who would criticize both male and female coworkers. However, viewing the record in the light most favorable to the EEOC, the court finds that the EEOC has generated a genuine issue of material fact on the issue of whether Spencer's harassment of Kirchhoff was based on sex.

In *Carter v. Chrysler Corp.*, 173 F.3d 693 (8th Cir.1999), the Eighth Circuit Court of Appeals recognized that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not be explicitly sexual in nature." *Carter*, 173 F.3d at 700–01 (internal citations omitted). Moreover, in *Beard v. Flying J. Inc.*, 266 F.3d 792 (8th Cir.2001), the Eighth Circuit Court of Appeals rejected the defendant's argument that the alleged harassment was not "based on sex," because the alleged harasser subjected males to the same kind of conduct that was the basis for the female plaintiff's sexual harassment claim. *See Beard*, 266 F.3d at 798. Specifically, the defendant in *Beard* argued that, because of the harasser's like conduct toward males, "women were not 'exposed to disadvantageous terms or conditions of employment to which [males were] not exposed,'" as required to show that the conduct was "based on sex." *Id.* (quoting *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir.

2000)). However, the Eighth Circuit Court of Appeals concluded that in a case supposedly involving the same conduct toward men and women,

[a] plaintiff ... need not show ... that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment. See *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996). Viewing the evidence in the light most favorable to [the plaintiff] a jury could reasonably find that the vast majority of [the harasser's] activities of a harassing nature was directed toward female employees, and could thus conclude that the harassment of [the plaintiff] was based on sex.

*Beard*, 266 F.3d at 798.

Here, the EEOC has generated a genuine issue of material fact that Kirchhoff, as the lone female employee worker in Animal Care, was the primary target of Spencer's "harassment," such that a reasonable jury could conclude that Spencer's conduct was "based on sex." First, it is clear that the type of comments Spencer made toward and about Kirchhoff differed from those he made to his male coworkers. In 1997, Spencer told Kirchhoff that she "ought to think about bidding out" of the department. In contrast, Ewing testified that when Spencer would point out a problem with his work he did not yell at him and never told him that he should bid out of the department or leave the department because he was not performing his work. Similarly, Blankenburg testified that when Spencer brought to his attention a problem with his work, Spencer did not yell at him or ever tell him to bid out of the department. Second, Spencer made a number of statements to his male coworkers in which he was critical of women in the workplace. For instance, Spencer told Pingel that he thought women could not work like he worked and that if he had to carry a

woman's work load then he should get her pay. Third, there is evidence in the record that Spencer treated Kirchhoff differently than he did his male coworkers. This is best exemplified by his actions regarding the deflated wheelbarrow tires incident. Two male Animal Control workers assigned to the LAC building after Kirchhoff did not inflate the tires of the wheelbarrow. When, on the following day, Spencer was assigned to work the LAC building, the wheelbarrow did not have air in its tires. Spencer was furious about it and yelled in reference to Kirchhoff, "I can't believe that dumb fucking bitch does not know how to run this air tank." Even though there were two male Animal Care workers who had worked in the LAC building after Kirchhoff, Spencer did not blame them for not filling the wheelbarrow tires with air. Nor did Spencer blame Fogelman, a male coworker who had worked part of the shift with Kirchhoff. Finally, Spencer payed particular interest to Kirchhoff's activities. Spencer would drive past the location where Kirchhoff was working and watch her while she worked. In 1998, while Kirchhoff was loading a truck, Spencer stood approximately 100 yards away and yelled, "What the fuck is taking you so long?", "What the fuck are you doing?" and "Jesus, you're slow." Spencer also treated male coworkers differently when they were working with Kirchhoff. For instance, in 1998, Spencer had yelled to Kirchhoff's male coworkers that they were doing all the work and that their backs must be hurting from carrying Kirchhoff all day. Thus, the court concludes that the EEOC has generated a material question of fact as to whether Spencer's conduct toward Kirchhoff was based on Kirchhoff's sex. Therefore, the court concludes that defendant Wyeth is not entitled to summary judgment on the ground that the EEOC cannot establish this element as a matter of law.

**2. Severe and pervasive requirement**

Defendant Wyeth further argues that it is entitled to judgment as a matter of law on the EEOC's hostile work environment claim because Spencer's alleged actions, if proven to be true, were not so severe or pervasive as to alter a term, condition, or privilege of Kirchhoff's employment. As the Eighth Circuit Court of Appeals also explained in *Beard*, with regard to this element of a sexual harassment claim, "Title VII makes actionable only conduct that is 'severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Beard*, 266 F.3d at 798 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295(1993)). To meet the required level of actionable harm, the EEOC has to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted); *accord Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir.2002) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367), *cert. denied*, —— U.S. ——, 123 S.Ct. 1789, 155 L.Ed.2d 695 (2003). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (internal quotation omitted). Thus, this element of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *Duncan*, 300 F.3d at 933. In determining whether the conduct is sufficiently severe

or pervasive, a court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *accord Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1128 (8th Cir.2000) ("In determining whether the alleged harassment is actionable, the totality of the circumstances must be considered, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.") (internal citations omitted). These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotations omitted). The Eighth Circuit Court of Appeals has observed that: "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992).

■ Here, viewing the evidence in the light most favorable to the EEOC, as the court must, the court finds that the EEOC has designated "specific facts showing that there is a genuine issue for trial" on the issue of severity and pervasiveness. *See* FED. R. CIV. P. 56(e) (the non-movant's burden). The EEOC points out that Spencer's alleged harassment of Kirchhoff commenced almost immediately upon her arrival in the Animal Care department with Spencer advising Kirchhoff to bid out of the department. The EEOC alleges

that Spencer subsequently started to drop by Kirchhoff's work site and make comments to her and her male co-workers. For instance, Kirchhoff states in her deposition that Spencer was apt to yell to her male coworkers such commentary as: "You're having to do all the work, man," "Make her do something," "You're looking tired," and "Your back must be getting tired from carrying her all day." EEOC App. at 3, Kirchhoff Dep. at 109. When male coworkers were scheduled to work with Kirchhoff, Spencer would be critical of them and make comments such as, "How is it going working with your girlfriend." EEOC App. at 165, Gillespie Aff. at 2. Spencer also would often stare or glare at Kirchhoff during the workday whenever they were together. Spencer would also drive past the location where Kirchhoff was working and watch her while she worked. For example, in 1998, while Kirchhoff was loading a truck, Spencer stood approximately 100 yards away and yelled, "What the fuck is taking you so long?", "What the fuck are you doing?" and "Jesus, you're slow." A jury could find these comments to be objectively humiliating to a woman.

Spencer's actions were not limited to non-physical actions. On one occasion, in May of 2001, Kirchhoff was sitting on a picnic table during break when Spencer came out of the break room and got into a truck with Rick Jones, looked back at Kirchhoff, floored the gas on the truck causing it to spin its tires and shoot rocks up at Kirchhoff. Moreover, Spencer allegedly made a comment to Steve Barlow, which was relayed to Pingel who in turn told Kirchhoff. Kirchhoff understood the comment to be a threat to burn down Kirchhoff's house and to harm her family.

Spencer also took actions which a jury could find to have been calculated to damage Kirchhoff's employment at Fort

Dodge Animal Health. For instance, on June 18, 2001, Kirchhoff and a coworker pulled up to the break area in a truck, and Spencer was in the truck ahead of them. When Kirchhoff parked, Spencer walked up to the passenger window of the truck and stated that Kirchhoff did not do her job down in Control and that she had starved the mice and hamsters and did not provide water for the animals. Spencer proceeded into the lunchroom and publically announced to the group of Animal Care workers present that Kirchhoff was lazy and had not properly fed and watered the mice in Control and that she was going to get a pink slip. Even after Pingel told Spencer that he and Rose had checked Kirchhoff's work and had found that the mice were all properly fed and watered, Spencer still reported to Ihrke that Kirchhoff had not fed the mice and that the food and water containers were completely empty. This complaint resulted in an investigation in which Ihrke ultimately determined that Kirchhoff's work in the Control area was acceptable. The EEOC asserts that the reason Pingel and Rose had checked on the mouse cages, and thus could substantiate Kirchhoff's claim, was that Kirchhoff had asked them to inspect her work because she was concerned that Spencer would be critical of it. Spencer's alleged actions criticized Kirchhoff's ability to perform her job. Spencer berated and humiliated her in front of her coworkers. The totality of Spencer's behavior undermined Kirchhoff's ability to perform her job.

In *Howard v. Burns Bros. Inc.*, 149 F.3d 835, 840 (8th Cir.1998), the Eighth Circuit Court of Appeals instructed that "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Spencer's conduct toward Kirchhoff was plainly improper. Moreover, there does not seem to be much doubt that Kirchhoff

subjectively found the conduct to be offensive. Thus, the court concludes here that the EEOC has designated "specific facts showing that there is a genuine issue for trial" on the issue of severity and pervasiveness, *see* FED. R. CIV. P. 56(e) (the nonmovant's burden). Therefore, this aspect of defendant Wyeth's Motion for Summary Judgment is denied.

### 3. Employer liability

The court turns, next, to the question of whether the EEOC can generate genuine issues of material fact that Wyeth should be held liable for the harassment to which Kirchhoff was allegedly subjected.

### a. Knew or should have known

To satisfy the last element of its sexual-harassment claim, the EEOC is required to prove the employer knew or should have known of the harassment, yet failed to take proper remedial action. *Rheineck,* 261 F.3d at 755; *Bogren,* 236 F.3d at 407; *Stuart,* 217 F.3d at 631; *Carter,* 173 F.3d at 700; *Davis v. Sioux City,* 115 F.3d 1365, 1367 (8th Cir.1997); *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996). The EEOC asserts that Kirchhoff made repeated complaints to her supervisors about Spencer's actions. Consequently, the EEOC contends that it has, at a minimum, generated genuine issues of material fact that Wyeth either knew or should have known of the sexual harassment by Spencer. Wyeth, however, counters that it was not until Kirchhoff filed her administrative charge of discrimination that Wyeth knew that Kirchhoff was complaining that Spencer's acts of harassment were sex based.

In light of the circumstances presented here, the court must address the question of what constitutes sufficient notice to an employer that alleged "harassment" is or may be based on a protected characteris-

tic? The Eighth Circuit Court of Appeals addressed such a question in *Jacob–Mua v. Veneman,* 289 F.3d 517 (8th Cir.2002). In *Jacob–Mua,* the plaintiff "reported to her supervisor the incident in which a co-worker argued with [her], yelled at her, and threw keys at her." *Id.* at 523. Nevertheless, the court concluded that the plaintiff failed to establish that the employer "knew or should have known" that the harassment was racially motivated. *Id.* As the Eighth Circuit explained:

> While the key-throwing incident may have been racially motivated, in Jacob–Mua's report of the incident to her supervisor, she did not declare, indicate, or even imply that the altercation had anything to do with race. The same co-worker who threw the keys also repeatedly asked Jacob–Mua invasive and arguably racial questions "about being black" such as "how often she wash[ed] her hair," and "how much does it cost to braid [her] hair." This co-worker told Jacob–Mua "slavery wasn't all that bad" and repeatedly interrogated Jacob–Mua with offensive questions like "[W]hen are [you] leaving?" and "[W]hen are [you] going back to Africa?" However, Jacob–Mua never informed her supervisor or other management of these questions. She also did not present evidence her supervisors were aware of this harassment. Evidence exists that, with respect to Jacob–Mua's hiring, Bratton stated "I have to accept a black woman as an employee that I don't even want." In a later coffee room conversation, on a work day when Jacob–Mua was wearing traditional African clothing, Bratton or another employee said, after Jacob–Mua left the room, "that was some dress," and each laughed. However, no evidence connects these comments to any hostile work environment created by Bratton or otherwise allowed to exist by the USDA. During the relevant time period, Jacob–Mua never submitted any written or oral report to her employer indicating she was the victim of any racial harassment. Furthermore, the record does not indicate her supervisor or employer should have known of any racial harassment. Absent evidence in the record indicating her employer or supervisor knew or should have known of racially harassing conduct, Jacob–Mua does not have a viable co-worker hostile work environment claim.

*Jacob–Mua,* 289 F.3d at 523.

■ The court in *Jacob–Mua* considered, first, whether the plaintiff had "declare[d], indicate[d], or even impl[ied] that the [complained of conduct] had anything to do with" a protected characteristic, in that case, race. *Id.* Thus, this court must first consider whether Kirchhoff ever "declare[d], indicate[d], or even impl[ied] that the [complained of conduct] had anything to do with [sex]." *Id.* In *Jacob–Mua,* the court also considered whether the plaintiff had reported certain incidents that, at least "arguably," would have disclosed a racial animus, which the court catalogued as "questions 'about being black' such as 'how often she wash[ed] her hair,' and 'how much does it cost to braid [her] hair,'" comments like " 'slavery wasn't all that bad,'" and other patently "offensive questions" like " '[W]hen are [you] leaving?' and '[W]hen are [you] going back to Africa?'" *Id.* Thus, in light of *Jacob–Mua,* this court concludes that sufficient notice may also be given that harassing or offensive conduct is based on a protected characteristic if the circumstances reported "arguably" suggest a discriminatory animus, even in the absence of the employee's specific declaration, indication, or implication that the conduct complained of has anything to do with a protected characteristic. By "arguably," this court assumes that, in the context of a summary judgment motion, the Eighth Circuit Court of

Appeals in *Jacob–Mua* meant evidence that a reasonable jury could find would have suggested to an employer that a discriminatory animus was afoot. *See id.* (considering appeal of district court's grant of summary judgment, and noting, inter alia, that "[s]ummary judgment should be cautiously granted in discrimination cases because such cases often depend on inferences rather than on direct evidence").

■ In the present case, the court finds that the EEOC has designated "specific facts showing that there is a genuine issue for trial," *see* FED. R. CIV. P. 56(e) (the non-movant's burden), on the issue of whether Kirchhoff ever specifically "declare[d], indicate[d], or even impl[ied] that [Spencer's harassment] had anything to do with [sex]." *See Jacob–Mua*, 289 F.3d at 523. The EEOC asserts that in February of 1998, a veterinary technician witnessed Spencer yelling at Kirchhoff several times, following her to her work area, even though he was not scheduled to work in that area, and glaring at her while she worked. The veterinary technician reported Spencer's conduct to Kirchhoff's supervisor, Ihrke. Ihrke told Kirchhoff that "by law" she had to report this to the Human Resources Department. Kirchhoff subsequently informed the then Director of Human Resources, Craig Wood, of Spencer's actions and the fact that she was afraid of him. Following the February 1998 complaint, Spencer's acts of harassment toward Kirchhoff did not cease. Kirchhoff continued to tell her supervisor Ihrke about Spencer's ongoing harassment from 1998 through 2000. The EEOC alleges that Kirchhoff told Ihrke that Spencer had followed her to a bar following a golf tournament, that he continued to stare or glare at her in the workplace, and that he was reviewing and criticizing her work. Ihrke told Kirchhoff's other supervisor, Van Patten, that Spencer was staring at Kirchhoff and that Kirchhoff was concerned that Spencer was obsessing about her.

On October 24, 2000, Kirchhoff reported to Ihrke that Spencer "was back at it again… [with] the yelling and the comments." Wyeth App. at 76, Kirchhoff Dep. at 123. Kirchhoff told Ihrke that she wanted Ihrke to take action on her complaint. Ihrke responded by contacting the Human Resources Department. The EEOC asserts that during Kirchhoff's meeting with Human Resources, specific references were made that this was a gender or sex issue. The EEOC asserts that during the meeting on October 27, 2000, Kirchhoff told Carlson, Ihrke and Van Patten that Spencer said a woman coming out into the Animal Care department would change everything. Kirchhoff also mentioned that Spencer had referred to her as the "girlfriend" of the male employees who worked with her. The EEOC asserts that during the meeting on October 30, 2000, with Carlson, Van Patten, Kirchhoff, and Spencer, Van Patten recognized that Kirchhoff's complaint had to do with sex. Van Patten allegedly told Spencer that the conflict between him and Kirchhoff was a gender issue between a man and a woman. When Kirchhoff met with Human Resources on August 16, 2001, following Spencer's alleged threat to burn down Kirchhoff's house and to harm her family, Kirchhoff told Hoffman and Ihrke that Spencer was having a difficult time with having a female in the Animal Care department. Kirchhoff also told them that Spencer had called her a "dumb fucking bitch" and that he was critical of Kirchhoff's work because she was a woman.

Moreover, during the processing of Spencer's union grievance following his termination, Carlson allegedly voiced concerns that the EEOC might ask questions and remarked, in response to the proposed reinstatement of Spencer, "If he has a problem working with women, where would I put him?" EEOC App. at 232, Internal correspondence at 3. Finally, in a

letter dated March 25, 2002, Carlson states in reference to the October 2000 meetings that: "All present have already confirmed that they walked away with the understanding that Mr. Spencer was informed that there would be "zero tolerance" for the continuation of behavior that created an environment of intimidation and/or sex based harassment." EEOC App. at 236, Letter at 1. Therefore, upon review of the summary judgment record before the court, the court concludes that the EEOC has met its burden to generate a genuine issue of material fact that Wyeth either knew or should have known that Spencer's conduct was gender-motivated. Thus, this aspect of defendant Wyeth's Motion for Summary Judgment is denied.

### b. Proper remedial action

Defendant Wyeth also argues that no reasonable jury could conclude that Wyeth failed to take appropriate measures to respond to Kirchhoff's complaints and end the harassment. The Eighth Circuit Court of Appeals has instructed that "[o]nce an employee complains to her employer about sexual harassment by a co-worker, the employer is on notice and must take proper remedial action to avoid liability under Title VII." *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997) (citing *Davis v. Tri–State Mack Distrib., Inc.*, 981 F.2d 340, 343 (8th Cir. 1992)); *Zirpel v. Toshiba Am. Information Sys., Inc.*, 111 F.3d 80, 81 (8th Cir.1997) (finding an employer must take prompt remedial action after it knew or should have known of harassment). In addition to conducting an investigation, the employer must take " 'prompt remedial action reasonably calculated to end the harassment.' " *Hathaway*, 132 F.3d at 1222 (citing *Davis*, 981 F.2d at 343); *Zirpel*, 111 F.3d at 81 (holding that summary judgment was properly granted in an employer's favor because the employer "promptly took 'remedial action . . . reasonably calculated to end the harassment' " once it knew or should have known about a harassing co-employee's behavior) (citing *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 269 (8th Cir.1993)). The employer cannot avoid liability by doing nothing simply because the co-worker denies that the harassment occurred. *Hathaway*, 132 F.3d at 1222 (citing *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1529 (9th Cir. 1995)). Indeed, an employer may take remedial action even where a complaint is uncorroborated. *Hathaway*, 132 F.3d at 1222 (citing *Knabe v. Boury Corp.*, 114 F.3d 407, 409, 413 n. 11 (3d Cir.1997)).

The Eighth Circuit Court of Appeals has observed that factors a court may consider when assessing the reasonableness of an employer's remedial measures include:

the amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of sexual harassment, and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment.

*Stuart*, 217 F.3d at 633 (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999)); *accord Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 756 (8th Cir. 2001) (citing *Stuart*, 217 F.3d at 633). Options for appropriate remedial action include taking disciplinary action to stop the harassment; transferring the alleged harasser to a different area where he or she would not come in contact with the complainant; scheduling the individuals involved on different shifts; putting a signed written warning or reprimand in personnel files; or placing the offending employee on probation pending any further complaints. *Hathaway*, 132 F.3d at 1222 (citing *Knabe,*

114 F.3d at 413); *Zirpel,* 111 F.3d at 81; *Intlekofer v. Turnage,* 973 F.2d 773, 780 n. 9 (9th Cir.1992); *Ellison v. Brady,* 924 F.2d 872, 881–82 (9th Cir.1991).

■ Here, the court further concludes that a genuine issue of material fact has been generated on the question of whether defendant Wyeth took appropriate actions which were reasonably calculated to end the harassment. The EEOC points out that Kirchhoff first complained about Spencer's actions in February of 1998, to both her supervisor and to Human Resources. However, neither Ihrke nor Wood ever talked to Spencer about his behavior. No disciplinary measures were taken against Spencer for his actions against Kirchhoff in 1998. Moreover, the EEOC alleges that Kirchhoff continued to tell her supervisor Ihrke about Spencer's alleged ongoing harassment of Kirchhoff from 1998 through 2000 but that it was only after Kirchhoff's complaint on October 24, 2000, that Ihrke went to Carlson. The parties vigorously dispute whether the resulting meeting with Spencer and Kirchhoff resulted in any remedial action. Wyeth contends that as a result of the meeting, Spencer was told by Carlson of Wyeth's "zero tolerance" for any further harassment and that if his behavior did not improve that he was subject to discipline up to and including discharge. The EEOC, however, notes that following the meeting, Ihrke told Spencer that he had done nothing wrong, there was nothing to prove that he had done anything wrong, that he had not received any disciplinary action and there was nothing in his personnel file. The EEOC further points out that Carlson never made any notation of any kind in Spencer's personnel file regarding the October meeting or the "zero tolerance" warning purportedly given to Spencer. Given Spencer's long history of harassing behavior towards Kirchhoff, a jury could reasonably determine that Wyeth's remedial actions were not reason-

able. Accordingly, Wyeth's Motion for Summary Judgment on the ground that the EEOC has failed to establish its prima facie case of a sexually hostile work environment is denied.

### C.  Retaliation

■ Defendant Wyeth also seeks summary judgment on plaintiff EEOC's retaliation claim. Under the sexual discrimination provisions of Title VII, 42 U.S.C. § 2000e–3(a), an employer is forbidden to retaliate against employees for opposing sexual discrimination. *Bogren v. Minnesota,* 236 F.3d 399, 407 (8th Cir. 2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001); *Ogden v. Wax Works,* 214 F.3d 999, 1007 (8th Cir.2000). Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's opposition to an employment practice made unlawful under Title VII or because of the employee's participation in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e. The Eighth Circuit Court of Appeals has held that the *McDonnell Douglas* burden-shifting framework applies to retaliation claims under Title VII. *Buettner v. Arch Coal Sales, Inc.,* 216 F.3d 707, 713–714 (8th Cir.2000); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The first step in this framework is the establishment of a prima facie case by the plaintiff. *Buettner,* 216 F.3d at 713–14. To establish a prima facie case of retaliatory discrimination, the EEOC must establish the following elements:

> (1) [Kirchhoff] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action.

*Gagnon v. Sprint Corp.,* 284 F.3d 839, 850 (8th Cir.), *cert. denied,* 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002); *Curd v. Hank's Discount Fine Furniture, Inc.,* 272 F.3d 1039, 1041 (8th Cir.2001); *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 685 (8th Cir.2001); *Buettner,* 216 F.3d at 713–714. In *Delashmutt v. Wis–Pak Plastics, Inc.,* 990 F.Supp. 689 (N.D.Iowa 1998), this court explained the "adverse employment action" element as follows:

> "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Montandon,* 116 F.3d at 359; See also *Manning,* 127 F.3d at 692 (quoting Montandon). [T]he adverse action does not have to be a discharge, see *Manning,* 127 F.3d at 692 ("[A]ctions short of termination may constitute an adverse employment action within the meaning of [42 U.S.C. § 2000e–3(a) ].""); *Kim,* 123 F.3d at 1060 ("[R]etaliatory conduct may consist of 'action less severe than outright discharge,'" quoting *Dortz,* 904 F.Supp. at 156), [but] the allegedly retaliatory conduct must nonetheless be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage." *Kim,* 123 F.3d at 1060 (some internal quotations and citations omitted) (citing *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994), and *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1435 (S.D.Iowa 1994), aff'd, 61 F.3d 908, 1995 WL 416214 (8th Cir.1995) (table) (No. 94–4081)). In *Kim,* the Eighth Circuit Court of Appeals explained that what the court must look for is "the kind of serious employment consequences that adversely affected or undermined [the employee's] position, even if [s]he was not discharged, demoted or suspended." *Kim,* 123 F.3d at 1060. Furthermore, the court may examine the cumulative effect

of the employer's allegedly retaliatory actions, rather than determining whether any individual action upon which the claim relies was sufficiently adverse.

*Delashmutt,* 990 F.Supp. at 699.

■ Defendant Wyeth initially asserts that until Kirchhoff's December 17, 2001, charge of sexual discrimination with the EEOC it was unaware that her complaints were based on sexual harassment. This is the same question that the court considered above in section II(B)(3)(a) in which it found that the EEOC had met its burden to generate a genuine issue of material fact that Wyeth either knew or should have known that Spencer's conduct was gender-motivated. Thus, the court concludes that Kirchhoff engaged in activity protected by Title VII prior to her filing her EEOC charge on December 17, 2001.

■ Wyeth also asserts that the EEOC has failed to establish the second element of its prima facie case for retaliation because it cannot demonstrate Kirchhoff suffered an adverse employment action since Kirchhoff was subject to nothing more than "shunning" or "ostracism." The court recognizes that the Eighth Circuit Court of Appeals has held that co-worker ostracism is not sufficient alone to rise to the level of an adverse employment action for purposes of Title VII. *See Scusa v. Nestle USA,* 181 F.3d 958, 969–70 (8th Cir.1999). However, the court finds that the cumulative effect of Wyeth's alleged participation and acquiescence in the retaliatory actions directed against Kirchhoff are sufficiently adverse to create a genuine issue of material fact. *Kim,* 123 F.3d at 1060. The EEOC alleges that approximately one-half of the workers in the Animal Care department currently are not scheduled to work with Kirchhoff. The decision not to schedule these employees with Kirchhoff is purportedly the result of Wyeth's approval of these employees' indi-

vidual requests not to be scheduled with Kirchhoff. Of the remaining workers in the Animal Care department who are scheduled to work with Kirchhoff, many of them refused to work as a team with Kirchhoff even though team work is essential. These actions resulted in Kirchhoff being forced to perform her duties without assistance from her coworkers. By implication, these actions have resulted in Kirchhoff being required to perform additional work. It is important to note that Wyeth's purported direct approval and acquiescence in Kirchhoff's coworker's retaliatory actions distinguishes this situation from the typical case of coworker ostracism. The court finds that based on the cumulative effect of these actions, and the ostracism and shunning that Kirchhoff allegedly suffered because she reported the sexual harassment, the EEOC has generated a genuine issue of material fact that Kirchhoff suffered an adverse employment action. *See Scusa,* 181 F.3d at 969–70 (explaining that without evidence of some more tangible change in duties or working conditions that constitute a material employment disadvantage, general allegations of co-worker ostracism are not sufficient to rise to the level of an adverse employment action for purposes of Title VII).

▇ Defendant Wyeth also argues that the EEOC cannot meet the third element of its prima facie case of retaliation—a causal connection between participation in the protected activity and the adverse employment action. The Eighth Circuit Court of Appeals explained in *Mathews v. Trilogy Communications, Inc.,* 143 F.3d 1160 (8th Cir.1998), that the causal connection: "may be established either through direct evidence of retaliation or circumstantial evidence 'such as proof that the discharge followed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive.'" *Id.* at 1166 (quoting *Rath v. Selection Research Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992));

*see Bassett v. City of Minneapolis,* 211 F.3d 1097, 1104 (8th Cir.2000) (finding less than two months between filing charge of discrimination and adverse action coupled with subsequent wave of increasing levels of disciplinary action created inference of causal connection). Here, defendant Wyeth asserts that legitimate business reasons lie beneath its scheduling decisions, namely, to promote group harmony within the Animal Care department. However, Wyeth stopped scheduling Kirchhoff with half of workers in the Animal Control department only after she complained about sexual harassment in the workplace. Moreover, these were not co-workers with whom Kirchhoff had any prior dispute. While the court views this as an extremely close question, based on the summary judgment record, the court concludes that this close temporal nexus between Kirchhoff's exercising her rights by complaining about sexual harassment in the workplace and the adverse employment action gives rise to a reasonable inference of retaliatory motive. Therefore, this aspect of defendant Wyeth's Motion for Summary Judgment is also denied.

## III. CONCLUSION

The court concludes that genuine issues of material fact preclude summary judgment on the EEOC's sexual harassment hostile work environment claim. The court further concludes that the EEOC has established a prima facie case of retaliation, thus precluding summary judgment on this claim. Therefore, defendant Wyeth's Motion for Summary Judgment is denied in its entirety.

**IT IS SO ORDERED.**